IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INSPIRE MEDICAL SYSTEMS, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 25-667-RGA ) |
| NYXOAH, INC. and NYXOAH SA, | ) ) |
| Defendants. | ) ) |

## MEMORANDUM ORDER

Before the Court is the motion of Defendants Nyxoah, Inc. and Nyxoah SA (collectively, "Nyxoah") to disqualify the law firm Latham & Watkins LLP ("Latham") from representing Plaintiff Inspire Medical Systems, Inc. ("Inspire") in this case. (D.I. 11). For the reasons set forth below, Nyxoah's motion to disqualify is GRANTED.

## I.   BACKGROUND

The relevant facts are largely not in dispute. (D.I. 21 at 1). Inspire is the creator of the Inspire system, a neurostimulation implant to treat sleep apnea. (D.I. 1 ¶¶ 20-30). Nyxoah sought to introduce its own sleep-apnea implant device, Genio, to the market to compete with Inspire. (D.I. 12 at 1). In 2021, Nyxoah pursued an initial public offering ("IPO") of stock in the United States to finance the development of Genio. (*Id.*). In connection with that process, Nyxoah retained Cantor Fitzgerald, L.P. ("Cantor Fitzgerald"), a financial services firm, to underwrite the IPO, and Cantor Fitzgerald was represented by Latham in the process. (*Id.* at 3). As is customary in underwriting, Cantor Fitzgerald conducted due diligence to determine the proper scope of representations that Nyxoah could make to the public under the Securities and Exchange Act. During that due diligence, Latham reviewed Nyxoah's financial documents, as well as Nyxoah's

internal documents discussing its Genio product and the scope of its intellectual property rights – and the scope of the rights of competitors, including Inspire. (*Id.* at 3-4).

Nyxoah's initial IPO closed on July 7, 2021. (D.I. 12 at 3). Nyxoah subsequently had three additional stock offerings underwritten by Cantor Fitzgerald. (*Id.* at 4-5). Each time, Cantor Fitzgerald was represented by Latham. (D.I. 13 ¶¶ 17, 25 & 32). And each stock offering was preceded by similar due diligence, all of which resulted in updated disclosures of the information provided with the initial offering. (*Id.* ¶¶ 19, 27, 33 & 34).

In early 2025, Morgan Stanley, another financial services firm, agreed to underwrite another of Nyxoah's proposed follow-on offerings. (D.I. 12 at 6). Latham also represented Morgan Stanley in the underwriting agreement with Nyxoah. (*Id.* at 6-7). Morgan Stanley also conducted due diligence in connection with the follow-on stock offering, which was largely the same as Cantor Fitzgerald's due diligence. (*Id.* at 7).

Before the 2025 stock offering, however, Latham withdrew from representing Morgan Stanley and Cantor Fitzgerald ("the Underwriters") because of a "business conflict." (D.I. 12 at 7; D.I. 21 at 12). That business conflict was ultimately revealed to be Latham's representation of Inspire in the present case, where Inspire alleges that Nyxoah's Genio infringes U.S. Patent Nos. 10,898,709, 11,806,526 and 11,850,424 ("the Asserted Patents"). (D.I. 12 at 7-8; D.I. 21 at 12; *see also* D.I. 1 ¶¶ 84-119). When the full scope of this "business conflict" became apparent to Nyxoah, Nyxoah requested that Latham voluntarily withdraw from representing Inspire in this case. (D.I. 12 at 8; D.I. 14, Ex. 1). Latham refused, opting instead to implement an "ethical screen." (D.I. 14, Ex. 2). Nyxoah then filed the pending motion (D.I. 11; *see also* D.I. 12, 13 & 14), and briefing on the motion was complete on September 5, 2025 (D.I. 21, 22, 23 & 26).

2

## II. LEGAL STANDARD

A court has the inherent power to disqualify an attorney from a representation. *See United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980). But motions to disqualify are "generally disfavored." *Talecris Biotherapeutics, Inc. v. Baxter Int'l Inc.*, 491 F. Supp. 2d 510, 513 (D. Del. 2007). The party seeking disqualification must clearly show that "continued representation would be impermissible" for a court to disqualify opposing counsel. *Id.* Determining whether representation is impermissible requires the Court to "carefully sift all the facts and circumstances." *Nemours Found. v. Gilbane, Aetna, Fed. Ins. Co.*, 632 F. Supp. 418, 428 (D. Del. 1986). If there are only "[v]ague and unsupported allegations," then the standard for disqualification is not met. *Conley v. Chaffinch*, 431 F. Supp. 2d 494, 496 (D. Del. 2006).

Attorney conduct in the District of Delaware is primarily governed by the Model Rules of Professional Conduct ("the Model Rules" or "M.R.P.C."). D. DEL. L.R. 83.6(d); *see In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984). When determining whether a conflict of interest exists among clients, there are two relevant rules: Model Rule 1.7, which involves conflicts between current clients, and Model Rule 1.9, which involves conflicts between a current and former client. *See* M.R.P.C. 1.7 & 1.9. Moreover, because of the importance in maintaining the public's confidence in the bar, a court may disqualify an attorney "for failing to avoid even the appearance of impropriety." *Kabi Pharmacia AB v. Alcon Surgical, Inc.*, 803 F. Supp. 957, 960 (D. Del. 1992). In these circumstances, a court may disqualify an attorney even if there is no violation of the Model Rules, instead relying on the court's inherent authority to supervise attorney conduct. *See Intell. Ventures I LLC. v. Checkpoint Software Techs. Ltd.*, C.A. No. 10-1067-LPS, 2011 WL 2692968, at *13 n.10 (D. Del. June 22, 2011); *see also In re Grand Jury Investigation*, 447 F. Supp. 2d 453, 458 (E.D. Pa. 2006) ("[D]isqualification need not be predicated upon the violation of any specific rule.").

## III. DISCUSSION

Both sides agree that Latham never had an attorney-client relationship with Nyxoah. (D.I. 21 at 3-4; D.I. 26 at 1). Although not raised by either side, the Court first addresses whether Nyxoah has standing to seek disqualification here despite never having any sort of fiduciary or attorney-client relationship with Latham.

Courts disagree on whether a non-client litigant has standing to bring a motion to disqualify. *See Santander Sec. LLC v. Gamache*, Civ. No. 17-317, 2017 WL 1208066, at *3-5 (E.D. Pa. Apr. 3, 2017) (summarizing split of authority). The Third Circuit has not squarely addressed the issue, first "assuming without deciding" that only a former client may raise disqualification, *In re Corn Derivatives*, 748 F.2d at 161, and then later "assuming without deciding" that non-clients may raise issues of disqualification, *In re Pressman-Gutman Co.*, 459 F.3d 383, 401 n.20 (3d Cir. 2006). The Court finds persuasive the reasoning of the First, Fourth and Fifth Circuits, which allow non-clients to bring motions to disqualify counsel. *See Kevlik v. Goldstein*, 724 F.2d 844, 847-48 (1st Cir. 1984); *United States v. Clarkson*, 567 F.2d 270, 271 n.1 (4th Cir. 1977); *Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977). Where, as here, a non-client faces a strategic disadvantage because its confidential information was accessed by opposing counsel and that information is highly relevant to the litigation at hand, the non-client has a sufficient personal stake in seeking disqualification such that standing exists. *Cf. Intell. Ventures*, 2011 WL 2692968, at *11 (counsel's knowledge of, *inter alia*, the former client's "strategies for potential patent litigation" and its methods of mitigating risk was a harm warranting disqualification).

4

In this case, Nyxoah seeks to disqualify Latham based on Model Rule 1.7 and based on this Court's inherent authority to prevent the appearance of impropriety.[1] The Court's analysis begins and ends with its inherent authority.

### A.     Appearance of Impropriety

Based on the years of access to Nyxoah's confidential information – including for the specific accused product here – Nyxoah maintains that Latham's representation of Inspire against Nyxoah in this case gives the appearance of impropriety. (D.I. 12 at 9-12; D.I. 26 at 5-7). In Nyxoah's view, the Court may – and must – use its inherent authority to disqualify Latham to avoid that appearance of impropriety. Latham insists the "appearance of impropriety" standard is no longer relevant. (D.I. 21 at 17 ("[T]his standard was discarded in 1983.")). The Court disagrees that the "appearance of impropriety" is no longer a ground for attorney disqualification.

Indeed, in *Intellectual Ventures*, Judge Stark appears to have rejected Latham's argument. *See* 2011 WL 2692968, at *13 n.10. There, another law firm had also argued that the "appearance of impropriety" standard no longer applied because that standard derived from Canon 9 of the Model Code of Professional Conduct, which was replaced by the Model Rules. *Id.* (citing *Nemours*, 632 F. Supp. at 423 ("In addition, Canon 9 states: 'A lawyer should avoid even the appearance of professional impropriety.' This provision does not appear in the Rules . . . .")). Although *Nemours* may have ostensibly cast doubt on the "appearance of impropriety" standard, Judge Stark emphasized that *Nemours* remained focused on a "flexible approach" that considers various policy rationales such as "preserving confidentiality." *Intell. Ventures*, 2011 WL 2692968, at *13 & n.10. Stated differently, the concerns underpinning Canon 9 of the now-replaced Model

---

[1] Nyxoah also cited Model Rule 1.9 as a basis for disqualification in the parties' pre-motion discussions. (*See* D.I. 14, Ex. 1 at 2 & 7). But Nyxoah appears to have dropped that argument as it never appears in the briefing. (*See* D.I. 12 & 26). As such, the Court does not address disqualification under Model Rule 1.9.

5

Code of Professional Conduct did not simply *go away* because the Model Code was replaced with the Model Rules. *See United States v. Stout*, 723 F. Supp. 297, 303 n.3 (E.D. Pa. 1989) ("[T]he dictates of Canon 9 survive its supersession."). Moreover, the Model Rules are only one aspect of a lawyer's professional obligations; other authority – such as relevant caselaw – may provide additional standards. *See* M.R.P.C. pmbl. ¶ 7. Breach of any of these ethical standards remains a basis for disqualification. The Court thus retains the authority to disqualify counsel for even "the appearance of impropriety." *See Apeldyn Corp. v. Samsung Elecs. Co.*, 693 F. Supp. 2d 399, 404 (D. Del. 2010); *see also In re Grand Jury Investigation*, 447 F. Supp. 2d at 458.

Turning to the specific facts of this case, the Court finds that Latham's continued representation of Inspire in this matter would appear deeply improper. Throughout the course of its four-year relationship with the Underwriters, Latham obtained access to confidential information from Nyxoah that is extremely pertinent to the present dispute. (*See* D.I. 14, Ex. 1 at 1-6 (Nyxoah detailing extent of access provided to Latham); *see also* D.I. 13, Ex. A (log of Latham attorneys accessing Nyxoah's data room documents)). This included access to internal documents detailing Nyxoah's views on its competitors' products – including Inspire's. (D.I. 13 ¶ 7). Indeed, one such document was a Nyxoah presentation titled "Inspire Competitive Intel." (*Id.*). Although it is unclear whether Latham reviewed this specific presentation,[2] Latham did access numerous other documents related to Nyxoah's intellectual property, Genio technical documents, clinical data, and correspondence with regulatory agencies regarding the Genio product. (*See, e.g.*, D.I. 13, Ex. A at 9-12, 18-20, 22-23, 27-28 & 36-37). And Latham had access to Nyxoah financial documents, including budget and sales documents. (*See, e.g., id.* at 17, 21 & 26).

---

[2] This document is not listed on the log of Latham access to Nyxoah's data room. (*See generally* D.I. 13, Ex. A).

Latham also participated in no fewer than six intellectual property due diligence calls with Nyxoah while advising either Cantor Fitzgerald or Morgan Stanley (D.I. 13 ¶¶ 11-14, 19-20, 27, 30, 34-35, 40-43; D.I. 13, Exs. E, G, M, O, R & T). During these often hour-long calls, Latham would request – and Nyxoah would provide – Nyxoah's internal views on its own intellectual property assets and products, including its ability to make and sell its Genio product without infringing other patents. (*See* D.I. 13, Ex. E ¶¶ 21, 24(i), 25; D.I. 13, Ex. G ¶¶ 6, 8; D.I. 13, Ex. M ¶¶ 6, 8; D.I. 13, Ex. O ¶¶ 6, 8; D.I. 13, Ex. R ¶¶ 6, 8; D.I. 13, Ex. T §§ II.1 & II.3). Indeed, on these calls, Latham solicited all freedom-to-operate analyses that Nyxoah had conducted and asked about any non-infringement or invalidity opinions that Nyxoah had obtained. (D.I. 13, Ex. E ¶¶ 21 & 26; D.I. 13, Ex. G ¶ 6; D.I. 13, Ex. M ¶ 6; D.I. 13, Ex. O ¶ 6; D.I. 13, Ex. R ¶ 6; D.I. 13, Ex. T §§ II.1 & II.3). Latham also asked about Nyxoah's own patent protection for Genio. (D.I. 13, Ex. E ¶ 17; *see also* D.I. 13, Ex. G ¶ 2, D.I. 13, Ex. M ¶ 2; D.I. 13, Ex. O ¶ 2; D.I. 13, Ex. R ¶ 2; D.I. 13, Ex. T §§ I.1(b) & (d) & II.3). And whether any trade secret protection exists for the Genio product. (D.I. 13, Ex. T § IV.1; *see also id.* § VI.1). Nyxoah settlements were discussed on some of these calls as well. (D.I. 13, Ex. E ¶¶ 32-33). Additionally, on at least two of the financial due diligence calls with Latham and the Underwriters, Nyxoah discussed its views of Inspire as a competitive threat, as well as its planned investments in and improvements to the Genio product. (D.I. 13, Ex. L; D.I. 13, Ex. P at 2; *see also* D.I. 13, Exs. C & V (agendas for other financial due diligence calls with Latham)). Nyxoah also provided Latham with detailed financial projections, including drawing on Genio's foreign success to discuss expectations for Genio's launch in the United States. (*See* D.I. 13, Ex. V).

The foregoing paints a picture of Latham repeatedly and consistently accessing Nyxoah internal documents and other non-public information relating to the Genio product – technical

information, analyses of legal exposure and financial expectations for the product launch in the United States. Latham then turned around and helped Inspire sue Nyxoah here for patent infringement based on that very Genio product. To the outside world, it appears that Latham has taken confidential information that Nyxoah willingly provided during underwriting and used it in a way not contemplated by any party in the underwriting process – *i.e.*, supporting a patent infringement action ***against*** Nyxoah. Stated differently, it appears that Latham has leveraged its prolonged access to confidential Genio information to garner business in the form of a patent-infringement suit against Nyxoah by one of Nyxoah's competitors. Whether this is, in fact, what happened is irrelevant. The appearance of impropriety is unavoidable, and disqualification of Latham would seem necessary here to avoid this appearance of impropriety.

      Notwithstanding these problematic optics, Latham nevertheless argues that Nyxoah cannot point to a single case where a court has disqualified underwriter's counsel for being adverse to the stock issuer in a subsequent case. (D.I. 21 at 4-5; *see also id.* at 5 (emphasizing that underwriters and stock issuers are adverse to each other)). That may be, but the type (or character) of the relationship between Latham, the Underwriters and Nyxoah is not the basis for disqualification here. Rather, Nyxoah grounds its request in the highly specific set of facts at issue here. Nyxoah seeks to disqualify Latham because Latham had years of access to confidential internal technical and financial information regarding the Genio product. And that Genio product is what Latham's client, Inspire, now accuses of infringement in this case. The appearance of impropriety is glaring.[3]

      Latham cites two instances where a court has refused to disqualify counsel who previously viewed a non-client's information while conducting due diligence for an underwriter: *HF*

---

[3] Indeed, a lack of adversity does not mean disqualification is unavailable. *See Blue Planet Software, Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 276 (S.D.N.Y. 2004).

*Management Services LLC v. Pristone*, 34 A.D.3d 82 (N.Y. App. Div. 2006), and *Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Technology, Inc.*, 69 Cal. App. 4th 1399 (1999). As an initial matter, neither case is binding on this Court. Moreover, neither case involved systematic and continuous access to a non-client's confidential information that would later be highly relevant to use against the non-client. The Court will nonetheless address both cases in more detail.

Turning first to *HF Management*, that case is inapplicable to the facts here. Because of "the nonfiduciary nature of the underwriter-issuer relationship," the *HF Management* court found that underwriter's counsel owed no duty of confidentiality to the stock issuer based on a purported fiduciary relationship. 34 A.D.3d at 84, 86-87. Although the stock issuer argued that the information it provided to the underwriter was nevertheless confidential, the court disagreed. *Id.* at 87. Because that information at issue was used to prepare, among other things, IPO documents, any confidentiality was lost because the stock issuer had no reasonable expectation that the underwriter's counsel would respect those confidences. *Id.* at 87. That is not the case here. Instead, the record demonstrates that Nyxoah reasonably expected the Underwriters to hold in confidence the specific details of the opinions disclosed during due diligence.[4] (D.I. 13 ¶ 8; *see also id.* ¶ 14 ("The information shared on the diligence calls was shared with the understanding and expectation that it would remain confidential.")). Latham has not rebutted this. And it would be non-sensical if that expectation did not also apply to Underwriters' counsel – Latham.

As to *Strasbourger*, that case involved a breach-of-contract suit after a stock issuer (Wiz) sold its shares in violation of an underwriting agreement between the stock issuer and underwriter (Strasbourger). 69 Cal. App. 4th at 1403. The stock issuer sought to disqualify underwriter and

---

[4] In fact, Nyxoah took several steps to ensure that the information in the data room remained confidential. (*See, e.g.*, D.I. 13 ¶ 6 (logging who entered the data room); *id.* ¶ 8 (limiting access to people approved by Nyxoah)).

9

auditor's counsel (Stroock & Lavan) because that counsel learned intricate details about the stock issuer's business and operations during the underwriting process. *Id.* at 1402-03. Much of the *Strasbourger* decision was focused on the lack of attorney-client relationship between the stock issuer (Wiz) and underwriter's counsel (Stroock & Lavan).[5] *Id.* at 1403-08. Nyxoah makes no such claim of an attorney-client relationship with Latham here. (D.I. 26 at 1). The *Strasbourger* court also addressed whether underwriter's counsel owed the issuer a duty of confidentiality even without an attorney-client relationship, focusing on a specific case cited by the issuer. 69 Cal. App. 4th at 1409. The court emphasized that an attorney's mere exposure to the confidences of an adversary does not mandate disqualification, instead focusing on whether the attorney received attorney-client information from its own client (or another attorney). *Id.* at 1410-11.[6]

Contrary to Latham's suggestion, this was not a case of Latham being inadvertently exposed to Nyxoah's confidential information or Nyxoah maliciously revealing information to try to disqualify Latham. Latham learned the contents of various intellectual property due diligence documents during Latham's representation of the Underwriters because of the "symbiotic" relationship between the Underwriters and Nyxoah. *See In re Equimed, Inc.*, C.A. No. 05-1815, 2006 WL 1865001, at *3 n.3 (E.D. Pa. June 30, 2006). Indeed, Nyxoah disclosed information to Latham directly during the many due diligence calls held among the parties. Moreover, the confidential information that Underwriter's counsel (Latham) obtained here is highly relevant to use against the stock issuer (Nyxoah) in the later litigation (this patent infringement case). Having advised the Underwriters on the strengths and weaknesses of Nyxoah's intellectual property and

---

[5]  The stock issuer argued that counsel actually represented the stock issuer during the underwriting process. The court disagreed. *Strasbourger*, 69 Cal. App. 4th at 1403-08.

[6]  The *Strasbourger* court explicitly noted that it was not deciding whether the auditor had a duty to keep the information confidential or whether the disclosed information was "substantially material" to later litigation. 69 Cal. App. 4th at 1411 n.7.

proposed Genio product, it is beyond problematic for Latham to now attack those weaknesses using the information that Nyxoah – not Inspire – provided Latham. *See Blue Planet Software*, 331 F. Supp. 2d at 276. And Latham learned more than mere factual information about Nyxoah while representing the Underwriters; Latham also learned information related to Nyxoah's likely trial strategy for this action. That is, the information disclosed during the underwriting relates to at least validity and infringement of Inspire's patents, as well as potential damages in this action. (*See, e.g.*, D.I. 1 ¶¶ 87, 92, 94; D.I. 18 ¶¶ 12, 21). Latham's awareness of this highly relevant confidential information puts Nyxoah at a disadvantage in the current litigation because Latham can anticipate Nyxoah's positions on these issues. *See Decaview Distrib. Co. v. Decaview Asia Corp.*, 2000 WL 1175583, at *10-12 (N.D. Cal. Aug. 14, 2000); *see also Roosevelt Irrigation Dist. v. Salt River Project Agric. Improvement & Power Dist.*, 810 F. Supp. 2d 929, 983 (D. Ariz. 2011).

Seemingly recognizing the problematic appearance of what has transpired, Latham emphasizes that none of this confidential information was provided to or accessed by the Latham team representing Inspire in this matter. (D.I. 21 at 9-11). And that all information alleged in the Complaint was sourced from publicly available documents. (*Id.* at 11). In Latham's view, any conflict should not be imputed to this particular team of Latham attorneys. (*Id.*). The Court disagrees. Even assuming that no confidential information passed to this Latham team, the appearance of impropriety still pervades. *See, e.g., Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 584-85 (D.N.J. 1994) (disqualifying a law firm because of "the importance of avoiding the appearance of impropriety," even though Model Rule 1.10(a) did not "clearly mandate" disqualification). The appearance of impropriety extends to the Latham litigation team here.

### B. Whether to Disqualify Latham

Even where a conflict exists, disqualification is not "automatic." *Boston Sci. Corp. v. Johnson & Johnson, Inc.*, 647 F. Supp. 2d 369, 374 n.7 (D. Del. 2009). Courts weigh the equities

11

before making the "momentous decision as to deny a party its chosen counsel." *Intell. Ventures*, 2011 WL 2692968, at *14. This is necessary because the ethical rules "should not be blindly applied without consideration of the relative hardships." *Carlyle Towers Condominium Ass'n v. Crossland Sav., FSB*, 944 F. Supp 341, 345 (D.N.J. 1996). In weighing the equities, courts consider numerous factors, such as attorney loyalty, prejudice to the parties, protecting the integrity of the judicial process, geography, timing of the motion to disqualify, duration of the prior representation, any delay (intentional or otherwise), size of the firm whose disqualification is sought, and the extensiveness of any screening. *See Intell. Ventures*, 2011 WL 2692968, at *14 (collecting equitable factors from various cases). The Court ultimately finds that the equities favor disqualification here.

As to timing of the motion, Nyxoah's motion was filed early in the case – before Nyxoah answered the Complaint. (*Compare* D.I. 11 (motion to disqualify filed August 15, 2025), *with* D.I. 18 (Answer filed August 25, 2025)). And Nyxoah attempted to resolve the issue earlier without resorting to motion practice. Any delay in seeking disqualification of Latham was minimal and not intentional. Moreover, the parties are in the very early stages of discovery. (*See* D.I. 30 (scheduling order entered on September 17, 2025)). Granting the motion is unlikely to disrupt the schedule. This weighs in favor of disqualification.

As to prejudice to the parties, Inspire's choice of counsel is given substantial weight. Yet as discussed above, there is notable prejudice to Nyxoah in allowing Latham to remain counsel for Inspire. Before this litigation commenced, Latham had obtained confidential and highly relevant information regarding the Genio product. Any use of that information – even inadvertent – in this case is undoubtedly prejudicial to Nyxoah. *See Metro Container Grp. v. AC&T Co.*, C.A. No. 18-3623, 2022 WL 1748550, at *4 (E.D. Pa. May 31, 2022) (analyzing the risk of prejudice as if the

appearance of impropriety were to be realized). For its part, Inspire claims that it would be inconvenienced if forced to retain another law firm and bring that firm up to speed. (D.I. 21 at 19). In the Court's view, the inconvenience to Inspire at this early stage does not outweigh the prejudice to Latham. The net prejudice therefore favors disqualification. *See Lowe v. Experian*, 328 F. Supp. 2d 1122, 1125 (D. Kan. 2004); *Intell. Ventures*, 2011 WL 2692968, at *14.

Latham is a law firm of substantial size (over 3,500 attorneys), which normally would suggest that there is little risk that confidential information about Nyxoah would spread. (D.I 23 ¶ 17). But some of the Latham attorneys who received these disclosures work in the same offices as the attorneys currently representing Inspire in this action. (D.I. 12 at 20; *see also* D.I. 1 at 35; D.I. 14, Ex. 1 at 2 nn. 2-3, 3 nn. 4-5, 4 nn. 6-7, 7 n.8 (Latham attorneys on the due diligence calls)). This lack of geographic separation also weighs in favor of disqualification, albeit slightly.

The Court must also give weight to preserving the public's confidence in the judicial system. Public confidence mandates that an attorney who learns confidential information directly from a party in the course of one relationship (here, the underwriting) should not ordinarily be allowed to later use that confidential information against the disclosing party when another more desirable relationship arises (here, representing Inspire in a patent-infringement suit).[7] Otherwise,

---

[7] The Court recognizes that this statement could be read to prevent a law firm who represented one patentee against an accused infringer from later representing another patentee against the same accused infringer (on the same or different accused product). The Court's statement is not so sweeping. In that scenario, the law firm obtained confidential information from opposing counsel through the decidedly adversarial process of litigation – and the accused infringer's information was produced to the other side with the expectation that the information would be used against the accused infringer. Protective orders exist to address improper later use. The situation here is fundamentally different. Here, Nyxoah willingly provided confidential technical and financial information directly to Latham pursuant to a "symbiotic" underwriting relationship – with the expectation that that information would be used to further Nyxoah's stock offering goals. Nyxoah's mechanism for dealing with improper later use of that confidential information appears limited to the present motion.

parties may be reluctant to engage in fulsome and honest discussions with attorneys. That the particular Latham team here may not be using any confidential information improperly does not remove the appearance of impropriety that is projected to the public by Latham's continued representation in this matter. Ultimately, the optics of Latham continuing to represent Inspire against Nyxoah undermines public confidence in the judicial system. This favors disqualification.

Finally, although Latham was never in an attorney-client relationship with Nyxoah, Latham did have access to Nyxoah's confidential information for over four years while Latham represented the Underwriters. (D.I. 12 at 16). The duration of that access is not insignificant. And, despite its argument to the contrary (D.I. 21 at 9), Latham's reactive decision to implement an ethical wall does not weigh against disqualification. That screen was implemented only months after the case against Inspire was formulated and the Complaint filed. (D.I. 12 at 20). Moreover, such walls are usually only effective when lawyers move firms, not – as is the case here – when the firm itself undertook the prior problematic representation. *See Intell. Ventures*, 2011 WL 2692968, at *13; *see also* M.R.P.C. 1.10(a)(2).

On balance, the Court finds that the equities weigh in favor of disqualification. Because disqualification of Latham is warranted under the Court's inherent authority, the Court declines to reach the parties' arguments under Model Rule 1.7.

\* \* \*

Latham and Nyxoah never had an attorney-client relationship. But this case is one of the likely few where the appearance of impropriety of a continued representation is so striking that disqualification must follow. Ignoring Latham's unfettered access to the very information most useful in a patent infringement case against Nyxoah – and allowing Latham to maintain this infringement case against Nyxoah – would prejudice Nyxoah and undermine the public's

14

confidence in the judicial system. The Court does not make this decision lightly but, after weighing the equities, concludes that it must disqualify Latham from representing Inspire in this litigation.

## IV. CONCLUSION

For the foregoing reasons, Nyxoah's motion to disqualify Latham from serving as Inspire's counsel in this action (D.I. 11) is GRANTED.

Dated: November 18, 2025

_____
UNITED STATES MAGISTRATE JUDGE